209 F.Supp.2d 731 (2002)
Michael M. CONWAY, et al., Plaintiffs,
v.
INTERNATIONAL ASSOCIATION OF HEAT AND FROST INSULATORS AND ASBESTOS WORKERS, et al., Defendants.
No. 1:00 CV 2897.
United States District Court, N.D. Ohio, Eastern Division.
February 12, 2002.
*732 *733 *734 *735 *736 Jeffrey L. Austin, Warren S. George, Uhlinger & Keis, Cleveland, OH, Geoffrey A. Belzer, James A. Climer, Richard G. Ross, Mazanec, Raskin & Ryder, Cleveland, OH, for Randy Walters, defendant.
Hermine G. Eisen, Eisen & Westfall, Cleveland, OH, for Robert Gray, defendant.
William I. Fadel, Wuliger, Fadel & Beyer, Cleveland, OH, Robert D. Kurnick, Jonathan D. Newman, Sherman, Dunn, Cohen, Leifer & Yellig, Washington, DC, for International Ass'n of Heat & Frost Insulators & Asbestos Workers, Gary Fujawa, James Grogan, defendants.
Joyce Goldstein, Bryan P. O'Connor, Goldstein & O'Connor, Cleveland, OH, for Dennis Maloney, Joseph P. Boyle, Jr., Michael M. Conway, Owen M. McCafferty, Thomas W. Reddy, plaintiffs.

Memorandum of Opinion and Order
GAUGHAN, District Judge.

INTRODUCTION
This matter is before the Court upon Plaintiff Conway's Motion for Partial Summary Judgment Concerning Liability on His Fifth Cause of Action (Doc. 77) and Labor Defendants' Motion for Summary Judgment (Doc. 76). This case arises out of the establishment of a trusteeship over the International Association of Heat and Frost Insulators and Asbestos Workers, Local 3 (hereafter "Local 3") by defendant International Association of Heat and Frost Insulators and Asbestos Workers (hereafter "International Union") and the disqualification of plaintiff Michael M. Conway from holding a Local 3 office. Plaintiffs, who are members and officers of Local 3, allege that the imposition of the trusteeship constituted a breach of the International Union Constitution and Bylaws and the disqualification of Conway without a full and fair hearing violated § 101(a)(5) of the Labor Management Reporting and Disclosure Act (hereafter "LMRDA"), 29 U.S.C. § 411(a)(5). In addition, plaintiffs assert state law claims of defamation and intentional infliction of emotional distress. For the following reasons, plaintiff's Motion is DENIED and Defendants' Motion is GRANTED.

FACTS
Defendant International Union is the international labor organization with which Local 3 is affiliated. (Bernard Third Decl. ¶ 2). Defendant Gary Fujawa is the International Vice President for the Central States Conference of the International Union. (Fujawa Second Decl. ¶ 1). At all times relevant, defendant James Grogan was the General Secretary-Treasurer of the International Union.[1] (Grogan Decl. ¶ 1). Defendants Robert Gray[2] and Randy Walters are insulation contractors and signatories to a collective bargaining agreement with Local 3. (Bernard Third Decl. ¶ 4).
Plaintiffs are members of Local 3, and, with the exception of plaintiff Dennis Maloney, each held a Local 3 office from July 1999 until removed by the International Union in July 2000. (Am.Compl. ¶¶ 2-6; Ans. ¶¶ 2-6). Conway served as Business Manager, Owen M. McCafferty served as Vice President, Thomas W. Reddy served as Financial Secretary, and Joseph P. Boyle served as Recording Secretary. (Am.Compl. ¶¶ 2-6; Ans. ¶¶ 2-6).
*737 Conway originally served a term as Local 3 Business Manager prior to December 1994, when he was defeated by Christopher Scarl in an election of Local 3 officers.[3] (Am.Compl. ¶ 11; Ans. ¶ 11). In or around March 1999, Scarl resigned from office. (Am.Compl. ¶ 13; Ans. ¶ 13). Also around that time, the United States Department of Labor commenced a criminal investigation of embezzlement of Local 3 funds. (Am.Compl. ¶ 14; Ans. ¶ 14).
Joseph Sweeny served as acting Business Manager after Scarl's resignation. (Sweeny Depo. 10). Despite the fact that the International Union Constitution and Bylaws call for vacant offices to be filled by special election within 50 days, the International Union delayed holding an election of Local 3 officers in order to conduct a financial audit. (Bernard Depo. 110, Ex. A). The election was eventually held on July 18, 1999, and Conway was elected to the position of Business Manager. (Conway Depo. 72). James S. Sullivan and Thomas Stafford, two Local 3 members who also ran for the position of Business Manager, protested and requested a new election on the grounds that Conway had improperly used union funds during his campaign. (Fujawa Depo. 152; Pltf.Ex. 23; Mollohan Depo. 69). William Bernard, who served as General President of the International Union from January 1989 through September 1, 2001, instructed Fujawa to conduct an investigation of the election. (Bernard Third Decl. ¶ 1; Fujawa Depo. 155). As part of his investigation, Fujawa met with Sullivan, Stafford and Mike Mollohan[4] and with Conway twice. (Fujawa Depo. 152-153, 173). According to Fujawa's report, Mollohan had reserved a room for a pension meeting in the building in which Local 3 offices are located. (Pltf.Ex.23). After the meeting, Conway made a campaign speech. (Pltf.Ex.23). Stafford and Sullivan contended that Conway was given "a distinct advantage because they were not afforded the same amount of time as their opponent." (Pltf.Ex.23). A second election was held on September 26, 1999, and Conway was again elected Business Manager. (Am.Compl. ¶ 28; Ans. ¶ 28).
Throughout the spring and summer of 2000, Bernard received several verbal reports from Grogan and a written report from Fujawa concerning the administration of Local 3 which he considered "very disturbing." (Bernard Third Decl. ¶ 4; Grogan Decl. ¶¶ 3, 6).
In May 2000, a series of meetings were held in Milwaukee, Wisconsin. (Grogan Depo. 187, Ex. 11). The International Union General Executive Board met first for a few days, then the local union Business Managers and Business Agents also met. (Grogan Depo. 187, Ex. 11). While in attendance at the General Executive Board Meeting, Grogan was informed by Ron Grant, International Union Organizer, that two Cleveland contractors had contacted the International Union with complaints concerning Local 3. (Grogan Depo. 192, Ex. 14). During a lunch break, Grogan and Fujawa called Walters, owner of R.W. Insulation, Ltd., to discuss his complaints. (Grogan Depo. 192; Snyder Depo. Ex. 1). Walters explained that he had become a signatory contractor with Local 3 twelve days previously and had been experiencing harassment ever since. (Grogan Depo. 193). Specifically, his employees felt threatened at their job sites. (Grogan Depo. 193). In addition, Walters reported that someone had gone to one of *738 his job sites at night and thrown some material down a shaft, causing damage. (Grogan Depo.Ex. 14). Walters also indicated that Gray, a fellow contractor who had also recently signed an agreement with Local 3, had been told that he would have to fire his existing employees and replace them with men from Local 3's out-of-work list.[5] (Grogan Depo. 195). Grogan asked that Walters and Gray put their complaints in writing and fax them to the hotel where the meeting was taking place. (Grogan Depo. 195). See also Bernard Third Decl. ¶ 5; Grogan Decl. ¶¶ 3, 6.
At this time, Grogan and Fujawa also spoke with Pat Roberts, co-owner of PatRican, Inc., who complained that she had requested but could not get manpower from Local 3. (Grogan Depo. 221; Snyder Depo.Ex. 1). She claimed that Conway refused to send Local 3 members because she had previously been delinquent in her fringe benefit payments and because her agreement with Local 3 had recently expired. (Grogan Depo. 223). Roberts told Grogan and Fujawa that she asked Conway to send her a new agreement in the mail, but Conway insisted she personally come to the Local 3 office to sign an agreement, made her wait 45 minutes and then claimed he could not find an agreement for her. (Grogan Depo. 223-224). Roberts also specifically asked Grogan and Fujawa if they believed she was being discriminated against by Local 3 because she was a black female. (Grogan Depo. 224). See also Bernard Third Decl. ¶ 5; Grogan Decl. ¶¶ 3, 6.
On May 23, 2000, Bernard, Fujawa, Grogan, Conway, Mollohan, Doug Gamble (International Union Director of Organizing) and Sweeny[6] met, and Bernard informed Conway of the contractors' complaints. (Grogan Depo.Ex. 11). Conway said the information was untrue. (Grogan Depo. Ex. 11).
The next day, Grogan attended a meeting of Local 3 officers in Akron, Ohio. (Grogan Decl. ¶ 2). He informed those in attendance of the contractors' complaints against Conway and stated, "if the allegations are true, I will have his f***ing job." (Grogan Decl. ¶ 4). While in the Cleveland area, Grogan met with Walters, obtained written statements from him and Gray and confronted Conway with the written statements. (Grogan Depo.Ex. 11).
Grogan reported all of the above to Bernard and told him that some contractors were threatening to take legal action. (Grogan Depo.Ex. 11; Bernard Third Decl. ¶ 5). He also reported that Conway had instructed a Local 3 officer to appoint members opposed to organizing to Local 3's organizing committee, criticized a Local 3 officer for signing agreements with contractors who were previously nonunion and did not fulfill his commitment to have at least 20 members present for an organization training session conducted by the International Union at great expense.[7] (Bernard Third Decl. ¶ 5).
A July 7, 2000 report from Fujawa to Bernard indicates that he also met with contractors in the Cleveland area to discuss issues concerning Local 3. (Bernard Third Decl. ¶ 6, Ex. B). According to Fujawa, the contractors "expressed extreme displeasure with Mike Conway and his lack of concern for their needs." (Bernard Third Decl. ¶ 6, Ex. B). Specifically, the *739 contractors complained that Local 3's out-of-work list was comprised of individuals who did not want to work, Conway told them they could get manpower "if they paid more money or worked overtime," and, when non-union individuals sought work and were told to go to the Union hall, no one from Local 3 would meet with them. (Bernard Third Decl. ¶ 6, Ex. B). Fujawa also reported that Conway was reluctant to remove individuals who could not or would not work from the out-of-work list because he was afraid they would take legal action. (Bernard Third Decl. ¶ 6, Ex. B). However, when asked to supply documentation showing that these individuals refused to work,[8] Conway indicated he did not maintain such documentation. (Bernard Third Decl. ¶ 6, Ex. B). In addition, Fujawa reported that Conway failed to contact other local unions to obtain available employees to refer to contractors. (Bernard Third Decl. ¶ 6, Ex. B). Fujawa concluded,
[W]ith Mike Conway in charge or I should state not taking charge it is just a comedy of errors. There is no doubt in my mind that if we let Mike Conway remain as Business Manager we will surely lose our share of that market place.
(Bernard Third Decl. ¶ 6, Ex. B).
Bernard also received copies of letters from Walters and Gray complaining of the problems reported by Fujawa and Grogan. (Bernard Third Decl. ¶¶ 4, 6).
The reports and letters convinced Bernard to place Local 3 under trusteeship. (Bernard Third Decl. ¶ 9; Bernard Depo. 168). Bernard avers,
I believed that the Local's conduct was jeopardizing its relationship with signatory contractors in the Cleveland area. I concluded that Local 3's treatment of those contractors and its failure properly to administer its referral procedure violated the Local's collective bargaining agreement and had created a substantial risk of lawsuits and liability for Local 3 and perhaps for the International. I also concluded that Local 3's hostility to newly-signed contractors and reluctance to accept new members contravened the International's policy of aggressively organizing nonunion employers and employees.
(Bernard Third Decl. ¶ 9). Based on the reports and his conclusions, Bernard determined that an emergency situation existed. (Bernard Third Decl. ¶¶ 9-10). Before imposing the trusteeship, Bernard polled the members of the General Executive Board and obtained their approval. (Bernard Third Decl. ¶ 12; Snyder Depo. 49-57). He then appointed Fujawa to serve as trustee. (Bernard Third Decl. ¶ 12).
On July 18, 2000, Bernard hand-delivered notice of the imposition of the trusteeship to Conway. (Bernard Third Decl. ¶ 13, Ex. C). The notice summarizes the reports and letters Bernard received and the basis for his decision to impose a trusteeship on Local 3 and states,
We simply cannot ignore the needs of contractors who sign our agreements or the desires of craftsmen who want to join our union. In addition to looking after the interests of our members and protecting their paychecks, we are also in the business of organizing contractors and workers and of providing contractors with the skilled manpower that they need. It appears that you have made little or no effort to organize, that you have discouraged officers of your union from organizing contractors, that you have attempted to undermine the business of those contractors who have recently *740 signed your agreement, and that you have not provided contractors with skilled workers or made much of an effort to do so.
(Bernard Third Decl.Ex. C). In addition, the notice indicates that a hearing will be held to determine whether the trusteeship should be ratified and continued. (Bernard Third Decl.Ex. C).
Bernard, Fujawa, Mollohan, Al Snavley[9] and Conway met on that date to discuss the imposition of the trusteeship. (Conway Depo. 202). Conway was verbally informed by Bernard that the trusteeship was being imposed "for failure to supply manpower to contractors and . . . failure to organize." (Conway Depo. 203-204). Although he was aware that several contractors had complained to the International Union, Conway was surprised and shocked by Bernard's decision to place Local 3 under a trusteeship. (Conway Depo. 202-203).
As a result of the imposition of the trusteeship, Local 3's officers were removed and temporary officers were appointed. (Bernard Third Decl. ¶ 13, Ex. D).
On or about August 16, 2000, a hearing was conducted by International Vice President Jack Keane at Bernard's direction to determine whether the trusteeship should be continued. (Bernard Third Decl. ¶ 14). Fujawa presented the case in support of continuing the trusteeship. (Fujawa Second Decl. ¶ 4). Conway represented Local 3 and was assisted by William Gorie, a Local 3 member who is an attorney. (Conway Depo. 215-216).
After the hearing, Kean submitted his recommendation that the trusteeship be continued to Bernard along with audio tapes of the hearing and exhibits that had been introduced. (Bernard Third Decl. ¶ 14). Bernard issued a written decision on October 16, 2000 continuing the trusteeship. (Bernard Third Decl. ¶ 15, Ex. D). The decision summarizes the original basis for imposing the trusteeship and the evidence presented at the ratification hearing. (Bernard Third Decl.Ex. D). Based on that evidence, Bernard concluded,
I have little doubt that the trusteeship over Local Union 3 was properly imposed and should be continued. It seems clearly apparent that, under your leadership, Local 3 was not aggressively organizing and was not fulfilling the manpower needs of its contractors. It also seems clear that you alienated several of the contractors in your jurisdiction. Your actions and inaction were jeopardizing the welfare of the local and its members. The local was not fulfilling its agreement with its signatory contractors nor was it fulfilling its obligation to organize, which is one of the primary and legitimate objects of this union.
(Bernard Decl.Ex. D).
Also on October 16, 2000, Bernard notified Conway in writing that a hearing would be conducted to determine whether he had failed to fulfill his duties under the International Union Constitution and Bylaws. (Bernard Third Decl. ¶ 21; Conway Depo.Ex. C-28). That notice states,
When the trusteeship was imposed, I did not fully appreciate the extent to which Local 3's problems had been caused by your failure to fulfill your obligations as local union business manager. The evidence presented at the trusteeship hearing, however strongly suggests that those problems were caused by your failure to carry out the duties imposed by the Constitution and Bylaws and *741 your failure to comply with a directive issued by the General Executive Board.
* * * * * *
Since the purpose of the recently-completed hearing was to determine whether the trusteeship over Local 3 should be continued  rather than whether you were personally responsible for the problems that existed and whether your conduct warranted removal or discipline  I am now directing that a hearing be conducted on the question whether you failed to perform your duties and failed to carry out binding directives and, if so, what penalty would be appropriate.
(Conway Depo.Ex. C-28). The notice also informed Conway of the nature of the charges against him and the relevant directives, policies and Constitutional provisions. (Conway Depo.Ex. C-28).
Conway's disciplinary hearing was conducted on November 20, 2000, after the International Union granted Conway's request for a 14-day postponement. (Bernard Third Decl. ¶ 21; Synder Decl. ¶ 2; Conway Depo. 371). International Vice President George Synder served as the Hearing Officer. (Synder Decl. ¶¶ 1-2). The hearing was tape-recorded and transcribed by a stenographer. (Synder Decl. ¶ 2, Ex. 1). Conway was assisted by James Huddleston and Dennis Maloney, and Fujawa acted as "prosecutor." (Conway Depo. 406-407). Conway's representatives were permitted to cross-examine the witnesses called by Fujawa, call 13 witnesses on Conway's behalf and introduce exhibits. (Conway Depo. 407; Maloney Depo. 111). In addition, Conway was permitted to testify on his own behalf. (Conway Depo. 407).
On April 12, 2001, Bernard issued a written decision prohibiting Conway from holding office for four years from the date of the decision. (Conway Depo.Ex. C-35). Based on the record presented at Conway's disciplinary hearing, Bernard determined that Conway failed to supply signatory contractors with manpower in accordance with applicable hiring rules and his obligations under the International Union Constitution and Bylaws and did not follow the International Union's directive to organize. (Conway Depo.Ex. C-35).
On May 22, 2001, plaintiffs filed a Motion for Temporary Restraining Order and Preliminary Injunction in an attempt to force defendant International Union to list Conway as a candidate for the Local 3 office of Business Manager. This Court denied plaintiffs' Motion.
On October 18, 2001, this Court granted the Motion to Dismiss for Lack of Subject Matter Jurisdiction and Motion for Judgment on the Pleadings filed by the International Union, Fujawa and Grogan and entered judgment in favor of defendants as to Counts One, Two and Six of the Amended Complaint.
Thus, three counts of the Amended Complaint remain. Count Three alleges the International Union breached its Constitution and Bylaws by imposing the trusteeship and removing Local 3's officers. Count Four alleges defendants defamed plaintiff Conway and intentionally inflicted emotional distress upon him. Count Five alleges defendants International Union and Fujawa failed to provide plaintiff Conway with a full and fair disciplinary hearing.
Conway now moves for summary judgment as to Count Five with regard to the issue of liability only. The International Union, Fujawa and Grogan[10] move for *742 summary judgment as to all plaintiffs' remaining claims.

STANDARD OF REVIEW
In accordance with Federal Rule of Civil Procedure 56(c), summary judgment is appropriate when there are no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (citing); see also LaPointe v. United Autoworkers Local 600, 8 F.3d 376, 378 (6th Cir.1993). The burden of showing the absence of any such genuine issues of material facts rests with the moving party:
[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrates the absence of a genuine issue of material fact.
Celotex, 477 U.S. at 323, 106 S.Ct. 2548. A fact is material only if its resolution might affect the outcome of the lawsuit under the governing law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).
Once the moving party has satisfied its burden of proof, the burden then shifts to the nonmoving party pursuant to Federal Rule of Civil Procedure 56(e), which provides:
When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleadings, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.
In ruling upon the motion, the court must afford all reasonable inferences and construe the evidence in the light most favorable to the nonmoving party. Cox v. Kentucky Dept. of Transp., 53 F.3d 146, 150 (6th Cir.1995) (citation omitted); see also United States v. Hodges X-Ray, Inc., 759 F.2d 557, 562 (6th Cir.1985). However, summary judgment should be granted if a party who bears the burden of proof at trial does not establish an essential element of his case. Tolton v. American Biodyne, Inc., 48 F.3d 937, 941 (6th Cir. 1995) (citing Celotex, 477 U.S. at 322, 106 S.Ct. 2548).

DISCUSSION

I. Imposition of Trusteeship
Plaintiffs allege that the imposition of the trusteeship on Local 3 constituted a breach of the International Union Constitution and Bylaws.
Defendants argue that Bernard's decision to impose a trusteeship on Local 3 is entitled to substantial deference. According to defendants, this Court should not examine whether the trusteeship was properly imposed, but only whether the decision to impose it was based on a reasonable and fair interpretation of the International Union Constitution and Bylaws.
Plaintiffs argue, however, that any deference to which defendants would normally be entitled is negated by their bad faith. Plaintiffs claim that this bad faith was based on a desire to remove Conway from office and is evidenced by the fact that the 1999 election was delayed until Sullivan was eligible to run for office and the International Union did not fully and adequately investigate the election protest. In addition, plaintiffs claim that defendants' interpretation of the International *743 Union Constitution and Bylaws was patently unfair and unreasonable in light of the fact that no trusteeship was imposed during Scarl's administration despite the fact that he engaged in the same conduct as Conway.
The Sixth Circuit has indicated that courts should be reluctant to substitute their own judgment for that of a union official's in the interpretation of a union's Constitution and Bylaws. Vestal v. Hoffa, 451 F.2d 706, 709 (6th Cir.1971). Instead, courts should observe the "well-established, soundly based policy of avoiding unnecessary judicial intrusion into the affairs of labor unions." Carpenters Local 267 v. United Broth. of Carpenters, 992 F.2d 1418, 1425 (6th Cir.1993). Interference is proper "only where the official's interpretation is not fair or reasonable" or where it is made in bad faith. Id. See also United Auto Workers Local 594 v. Int'l Union UAW, 956 F.2d 1330, 1337 (6th Cir.1992) (holding that where union's conduct is unconscionable, bad faith will "strip away the protection from judicial interference to which the union would normally be entitled otherwise"); Dept. of Labor v. Aluminum Brick & Glass Workers Int'l Union, 941 F.2d 1172, 1177 (11th Cir.1991) ("The union's interpretation of its own documents will be respected only to the extent it is fair and reasonable.").
Thus, in this case, plaintiffs can survive summary judgment only if they establish that the decision to impose a trusteeship on Local 3 was made in bad faith or based on an unfair or unreasonable interpretation of the International Union Constitution and Bylaws.

A. Bad Faith
As evidence of defendants' bad faith, plaintiffs claim that the International Union purposely delayed the Local 3 election so that Sullivan would be eligible to run for the office of Business Manager and improperly upheld Sullivan's election protest.[11] However, plaintiff presents no evidence to support these contentions.
To the contrary, the evidence submitted in this case indicates that the election was delayed so that an audit of missing funds could be conducted. (Bernard Depo. 110). Bernard testified,
[The issue of missing funds] could affect the outcome of the election and in fairness to the honest people in the membership I think they should know what's going on with their money and is anybody involved in it and who is involved in it and if nobody is involved in it. That's what motivated me to delay the election.
(Bernard Depo. 110). Plaintiffs have not presented evidence that Bernard was even aware that Sullivan intended to run for the office of Local 3 Business Manager in 1999.[12] In addition. Conway testified that he did not know "whether there was some other reason [than the audit] for postponing the election." (Conway Depo. 53).
Plaintiffs argue that no provision of the International Union Constitution and Bylaws allows for the delay of a local union election for the purpose of conducting a *744 financial audit.[13] However, no provision expressly prohibits such a delay. Article VII, Section 5(a) provides that the "General President shall have authority to order an audit of the finances of any local union whenever he deems such action necessary for the protection of the International Association, the local union or its members." (Bernard Third Decl.Ex. A). Bernard testified that, under his interpretation, the International Union Constitution and Bylaws permitted the delay. (Bernard Depo. 112). This Court finds that Scarl's resignation and the investigation by the Department of Labor created circumstances such that Bernard's interpretation of the International Union Constitution and Bylaws was, while perhaps not accurate under its express terms, reasonable and fair. Thus, the fact that defendants delayed the election does not constitute evidence of bad faith.
Plaintiffs also argue that Fujawa should have reviewed documentation submitted by Conway showing that Local 3 money was not used to pay for the meeting room in which he gave a campaign speech. However, the evidence establishes that the meeting room was a benefit provided by the landlord to its tenants. (Bernard Depo. 130-131; Mollohan Depo. 71: Fujawa Depo. 170-171). Because Local 3 used union funds to pay rent, defendants determined that union funds had secured the use of the meeting room. (Bernard Depo. 130-131; Fujawa Depo. 170-171). This Court finds that defendants conducted an adequate investigation into the election protest and made a reasonable determination that Conway used union funds in support of his campaign. The fact that plaintiffs disagree with the International Union's decision to hold a second election does not establish that defendants acted in bad faith.

B. Unfair or Unreasonable Interpretation
Plaintiffs also argue that the imposition of the trusteeship was based on an unfair and unreasonable interpretation of the International Union Constitution and Bylaws. According to plaintiffs, Local 3 complied with the International Union's organizing policy by commencing and completing COMET[14] training, establishing an organizing committee and developing organization policies. Plaintiffs also argue that Conway's administration of the out-of-work list did not justify imposition of the trusteeship because the same hiring hall practice was in place during Scarl's administration. Finally, plaintiffs argue that Conway was justified in failing to provide contractors with workers on two occasions.
Article X, Section 16 of the International Union Constitution and Bylaws governs the imposition of trusteeships and states, in pertinent part,
Section 16(a). The General President, with the approval of the General Executive Board, may appoint a trustee to take charge of the affairs of any local whenever he has reason to believe that the affairs of the local are not conducted in accordance with the Constitution and Bylaws of the International Association; or are being conducted in such a manner as to jeopardize the interests of the International Association or the local or its *745 members; or whenever he believes that such action is necessary for the purpose of correcting corruption or financial malpractice, assuring the performance of collective bargaining agreements or other duties of a bargaining representative, restoring democratic procedures, or otherwise carrying out the legitimate objects of the International Association or the local union.
* * * * * *
(b). Whenever the General President believes it feasible to do so, he shall set a time and place for a hearing, for the purpose of determining whether trusteeship shall be imposed, prior to the appointment of a trustee. If in his judgment an emergency situation exists within the local union, however, the trustee may be appointed prior to such hearing; but in such event a hearing shall be scheduled within a reasonable time (usually thirty (30) days after the appointment of the trustee).
(Bernard Third Decl.Ex. A).
As set forth above, this Court will not reexamine the issue of whether the trusteeship was properly imposed. Rather, this Court's review is limited to the issue of whether defendants' actions are supported by a fair and reasonable interpretation of the International Union Constitution and Bylaws.
Based on the evidence presented, this Court finds that Bernard's determination that an emergency situation existed and justified the imposition of a trusteeship did not violate the International Union Constitution and Bylaws. Prior to that determination, Bernard received reports that Local 3 was not fulfilling its obligation to provide manpower to signatory contractors, properly administering its hiring hall or complying with the International Union's organization policy. To the contrary, contractors had threatened to sue based on complaints that they and their employees were being harassed and they were not able to obtain needed manpower. Despite plaintiffs' arguments to the contrary, Bernard possessed sufficient information at the time he imposed the trusteeship to reasonably and fairly determine that Local 3's affairs were not being conducted in accordance with the International Union Constitution and Bylaws and were being conducted in such a manner as to jeopardize the interests of the International Union, Local 3 and/or its members. Plaintiffs do not dispute that Bernard received the reports he claims to have received, and their assertion that some of Conway's actions were justified or proper does not establish that Bernard lacked reason to believe imposition of the trusteeship was necessary.
During his deposition, Conway admitted that he told Richard Berry, owner of Berry Insulation, that Local 3 members would probably be more willing to work for him if he paid them according to the Cleveland pay scale.[15] (Conway Depo. 112). Conway also admitted that Berry hired employees off the street because he was not able to provide four requested insulators within 48 hours. (Conway Depo. 112). Conway admitted that he was unable to find an agreement for Roberts to sign after instructing her to come to the Local 3 office. (Conway Depo. 194-195). In addition, Conway admitted that he was not able to provide Roberts with requested manpower.[16] (Conway Depo. 196).
*746 Conway also admitted that the first 30 individuals listed on Local 3's out-of-work list were unavailable for work, primarily because they were out of town, and only six out of 44 were actually available. (Conway Depo. 127-128).
Conway testified that he was aware of the International Union's policy concerning organization and that a local union attempting to disrupt organization efforts would be sanctioned. (Conway Depo. 135). In addition, Conway himself testified that he did not think the imposition of the trusteeship violated the International Union Constitution and Bylaws. (Conway Depo. 250).
Because this Court finds that the trusteeship was imposed in accordance with a reasonable and fair interpretation of the International Union Constitution and Bylaws and plaintiffs have failed to present sufficient evidence of bad faith, defendants are entitled to summary judgment as to Count Three.

II. Plaintiff Conway's Disciplinary Hearing
The parties have filed cross-motions for summary judgment as to Count Five and agree that no genuine issue of material fact exists with regard to plaintiffs' allegation that Conway was denied a full and fair disciplinary hearing. Plaintiffs argue that Conway's disciplinary hearing was conducted in violation of § 101(a)(5)(C) the LMRDA because his guilt was prejudged, he was not provided with all of the documents he requested prior to and during the hearing and the charges against him were untimely. Defendants claim that Conway was afforded a full and fair disciplinary hearing.
Section 101(a)(5) of the LMRDA provides,
No member of any labor organization may be fined, suspended, expelled, or otherwise disciplined except for nonpayment of dues by such organization or by any officer thereof unless such member has been (A) served with written specific charges; (B) given a reasonable time to prepare his defense; (C) afforded a full and fair hearing.
29 U.S.C. § 411(a)(5). Plaintiffs do not dispute that Conway was served with a written description of the charges against him and given a reasonable time to prepare his defense. Instead, plaintiffs argue that Conway was denied a full and fair hearing due to the fact that defendants prejudged his guilt, failed to produce documents necessary for his defense and brought untimely charges against him.

A. Pre-Judgment
According to plaintiffs, Bernard prejudged Conway's guilt based on the evidence presented at the trusteeship ratification hearing. Because this evidence had already been credited by Bernard and was substantially the same as that presented at the disciplinary hearing, Conway was denied a full and fair, i.e., impartial, hearing. Plaintiffs also claim that Bernard admitted that he had already decided Conway was guilty before his disciplinary hearing.
Defendants argue that plaintiffs have failed to present evidence that Bernard improperly prejudged Conway's guilt. According to defendants, the LMRDA does *747 not prohibit the same union official from deciding closely-related cases. In addition, defendants argue that the purposes of the ratification and disciplinary hearings were different and the evidence presented at the two was similar but not identical.
The Supreme Court has recognized that § 101(a)(5)(C) of the LMRDA "guarantees union members a `full and fair' disciplinary hearing." Int'l Brotherhood of Boilermakers, Iron Shipbuilders, Blacksmiths, Forgers and Helpers v. Hardeman, 401 U.S. 233, 245, 91 S.Ct. 609, 28 L.Ed.2d 10 (1971). "[T]his guarantee requires the charging party to provide some evidence at the disciplinary hearing to support the charges made." Id. The "some evidence" standard prohibits review of union disciplinary proceedings to determine the scope of offenses for which a union member may be disciplined. Id. at 244, 91 S.Ct. 609. See also Superintendent v. Hill, 472 U.S. 445, 449-450, 105 S.Ct. 2768, 86 L.Ed.2d 356 (1985) (stating relevant question under "some evidence" standard is "whether there is any evidence in the record that could support the conclusion reached by the disciplinary board"); Corea v. Welo, 937 F.2d 1132, 1135 (6th Cir.1991) ("[W]hile union members have the right to sue to enforce their rights under LMRDA, the courts should be reluctant to interfere in internal union affairs.").
However, the "some evidence" standard does not preclude courts from examining a disciplinary hearing for bias or prejudice or considering "a challenge to the essential fairness of and motivation for the proceedings." Perry v. Int'l Longshoremen's Assoc., 638 F.Supp. 1441, 1448 (S.D.N.Y.1986). "Evidence of a partial board is violative of the LMRDA." Mayle v. Laborer's Int'l Union of N. Am. Local 1015, 866 F.2d 144, 146 (6th Cir.1988). See also Myers v. Affiliated Property Craftsmen Local No. 44, 667 F.2d 817, 820 (9th Cir.1982) ("An unbiased or untainted finder of fact is fundamental to a full and fair hearing and procedural due process."); Falcone v. Dantinne, 420 F.2d 1157, 1166 (3d Cir.1969) ("An essential element of a fair hearing . . . is the impartiality, i.e., openmindedness, of the trial body."). Thus, an inquiry into whether Conway was provided with a full and fair hearing may "include a determination of whether the members of the tribunal prejudged the guilt of the accused and whether the discipline was merely a pretext for general political retaliation." Perry, 638 F.Supp. at 1448.
As an initial matter, this Court notes that the mere fact that Bernard received reports of Conway's alleged misconduct prior to the hearing, directed that the hearing be held and acted as the final adjudicator of the charges does not constitute a violation of Conway's due process rights. See Withrow v. Larkin, 421 U.S. 35, 53-54, 95 S.Ct. 1456, 43 L.Ed.2d 712 (1975); Wildberger v. American Federation of Government Employees, 86 F.3d 1188, 1195 (C.A.D.C.1996) (stating "combination of investigative, prosecutorial, and adjudicatory functions in the President does not, by itself, violate the LMRDA").
Bernard's October 16, 2000 letter to Conway indicates his belief that the evidence presented at the ratification hearing "strongly suggests" that Local 3's problems were caused by Conway's failure to carry out the duties imposed by the Constitution and Bylaws and comply with a directive issued by the General Executive Board. Conway raised the issue of pre-judgment as early as November 12, 2000, when he asked Bernard to dismiss the charges against him "in light of the fact that you and every other member of the International Executive Board have already pre-judged these issues and are incapable of being impartial." (Pltf.Ex.50). *748 Bernard responded by stating that he did not agree with Conway's allegation of bias:
After due deliberation, the members of the General Executive Board have concluded that the problems with Local Union 3 warranted the imposition of a trusteeship. Whether and to what extent you were responsible for those problems, whether you complied with the Constitution and Bylaws, whether you carried out all lawful instructions, and whether your conduct warrants discipline remains to be determined.
(Pltf.Ex.51). Similarly, Bernard's April 12, 2001 decision letter states,
As I stated in my October 16, 2000, letter to you, the trusteeship hearing was not concerned with whether your conduct warranted disciplinary action against you. Therefore, I ordered a separate hearing, before a separate Hearing Officer. For the same reason, my decision in this matter is limited to the record developed at the November 20, 2000, hearing. I have not relied on any evidence presented at the trusteeship hearing.
(Conway Depo.Ex. C-35). In addition, Bernard avers,
The issue in [Conway's] disciplinary hearing was very different from the issue in the trusteeship hearing. The trusteeship hearing focused on how the Local as an institution had been conducting its affairs. To be sure, there was testimony about Michael Conway at the trusteeship hearing, but his individual responsibility for the failings of the Local was not at issue. In the disciplinary hearing, the focus was on Conway and whether he had failed to fulfill his own obligations as a local union officer. Conway could be disciplined only if the evidence showed that he had personally failed to fulfill those obligations.
(Bernard Third Decl. ¶ 22).
During his deposition, Bernard was questioned about the difference between the ratification hearing and Conway's disciplinary hearing:
Q: How could you have reached a different discipline on Mike Conway's?
A: Once the trusteeship was determined, this thing  there was no other way this could come out because it was locked in.
Q: That was my suggestion, sir.
A: Well, I don't think that was the case. First hearing was there reason enough to keep the trusteeship in place. . . . The second one, we then said here, now we focused on the business manager, has he done his job properly. . . . And we didn't think he did.
Q: But crediting the reasons that were offered at the trusteeship hearing, how could you have then reached a different decision on discipline?
* * * * * *
A: If he would have come up with some evidence that he  that could change my opinion or change my mind, but he didn't come up with anything that would change my mind. The fact that there was so many things involved. After reading the transcript I made my decision. I put in it print.
(Bernard Depo. 458-459).
This Court finds that Bernard's deposition testimony and the documentary evidence presented in this case establish only that he determined that a disciplinary hearing was warranted based on the evidence presented at the ratification hearing. Contrary to plaintiffs' arguments, Bernard's testimony does not establish that he prejudged Conway's guilt prior to the disciplinary hearing. Obviously, Bernard was *749 required to base his decision to hold the disciplinary hearing on some evidence of misconduct by Conway. Conway, however, was given an opportunity to prepare and present a defense to the charges against him. Plaintiffs have offered nothing other than their own unsupported allegations of bias to contradict Bernard's testimony.[17] Therefore, this Court finds that Bernard based his decision to hold Conway's disciplinary hearing on his legitimate assessment that one was warranted and reserved final judgment until after he reviewed the hearing transcript. Cf. Stein v. Mutuel Clerks' Guild of Mass., Inc., 560 F.2d 486, 489-491 (1st Cir.1977) (finding plaintiff not provided full and fair hearing where one member of Executive Committee opined prior to hearing "that the men charged were guilty and ought to be punished"); Tincher v. Piasecki, 520 F.2d 851, 855 (7th Cir.1975) (finding plaintiff not provided with full and fair hearing where person charged by him in collateral proceeding participates in the adjudication of the his disciplinary hearing); Falcone, 420 F.2d at 1167 (finding plaintiff not provided full and fair hearing where one member of Trial Board admitted he "made up [his] mind" prior to hearing); Perry, 638 F.Supp. at 1448-1449 (finding plaintiff not provided with full and fair hearing where union constitution prohibited charging party from sitting on hearing panel, yet two members of panel were authors of charges and third member expressed his view of plaintiff's guilt prior to hearing).
Plaintiffs rely on Rosario v. Amalgamated Ladies' Garment Cutters' Union, Local 10, 605 F.2d 1228 (2d Cir.1979), and Feltington v. Moving Picture Machine Operators Union Local 306, 605 F.2d 1251 (2d Cir.1979), in support of their argument that Conway was denied a full and fair disciplinary hearing.
In Rosario, the plaintiffs were tried before their local union Executive Board for interference with union operations and conduct unbecoming a union member. 605 F.2d at 1235. On appeal to the General Executive Board, the convictions were vacated. Id. However, new disciplinary charges were filed, and plaintiffs were once again tried before the local union Executive Board. Id. Several members of the Executive Board which presided over the plaintiffs' second trial had also presided over the original trial, and the plaintiffs argued that they were, therefore, denied a full and fair hearing. Id. The court agreed and held that "disciplinary charges cannot be heard upon remand for a new trial before those who previously heard the charges." Id. at 1243.
The facts of Feltington are substantially similar, and the cases were decided on the same day by the Second Circuit. 605 F.2d at 1253. In Feltington, the court stated,
The risk is too high that individuals who have heard and decided a case will not consider the evidence with an open mind a second time. Moreover, they are unlikely to acknowledge that they have prejudged the case.
Id. at 1256-1257.
In this case, however, Conway's disciplinary hearing was not a retrial of a previous hearing upon remand. Although much of the evidence presented at the two hearings was the same, the focus and purpose of each were distinct. A determination that a continuation of the trusteeship *750 was necessary to protect the interests of the International Union and Local 3 is not synonymous with a finding that Conway engaged in the misconduct with which he was charged. In addition, the International Union instituted a safeguard to protect against pre-judgement that was not present in Rosario: Bernard appointed a different hearing officer to preside over Conway's disciplinary hearing than the one who presided over the ratification hearing. Plaintiffs attempt to minimize the significance of this fact by pointing out that Bernard made the ultimate determination with respect to both hearings. However, in light of the fact that plaintiffs failed to establish that Bernard was biased or predisposed against Conway, this Court finds that Conway was provided with a full and fair disciplinary hearing. Cf. Wildberger, 86 F.3d at 1193-1196 (finding plaintiff not provided with full and fair hearing where international president, who was once plaintiff's political opponent and the subject of repeated criticism by plaintiff, initiated, investigated and adjudicated charges against plaintiff).
Plaintiffs also argue that Bernard's pre-judgment of Conway's guilt is established by the fact that Bernard persisted in crediting the allegations against Conway, even in light of evidence to the contrary, and failed to discipline Scarl or Fujawa for engaging in the same conduct. However, these arguments are nothing more than a veiled request that this Court examine the adequacy of the evidence presented at the disciplinary hearing. As stated above, the relevant issue is whether there is any evidence in the record that could support Conway's discipline. This Court has no trouble finding that such evidence exists.
The following testimony was presented at Conway's disciplinary hearing:
1. Grogan testified that Conway failed to fulfill his promise to have 20 people present for a COMET training session and initially lied about being present at Walters's job site the night material was thrown down a shaft. In addition, Grogan testified concerning the complaints he had received from various contractors about Conway.
2. Roberts testified that Conway complained about her company to the VA Hospital and Cleveland Metropolitan Housing Authority. In addition, Roberts testified that she had trouble obtaining manpower from Local 3 and that Conway hindered, rather than assisted, her ability to do so.
3. Berry testified that he had trouble obtaining an out-of-work list from Conway. Specifically, Berry testified that the current Local 3 administration maintained three separate out-of-work lists but only provided him with one, while he had received an out-of-work list from the previous Local 3 administration on a weekly basis. Berry also testified that people on the out-of-work list were not available and Conway did not provide him with requested manpower on a job in Mansfield but told him he would have to pay Local 3 members more money if he wanted them to work on that job.
4. Mollohan testified that Conway indicated Local 3 would take a "wait and see" approach to establishing an organizing committee, instructed him to appoint two people to the organizing committee who were opposed to organizing, criticized him for signing an agreement with Walters and told him "he couldn't be running around half cocked signing every non-union contract."
5. Fujawa testified Conway failed to provide him with requested paperwork *751 relating to the operation of the hiring hall. Fujawa also testified that contractors in the Cleveland area complained to the International Union about the operation of Local 3's hiring hall.
6. Walters testified that he could not obtain union jobs while Conway was Business Manager of Local 3 but could after the trusteeship was imposed. Walters also testified that Conway admitted being present at his job site the night material was thrown down a shaft.
(Conway Depo. 414-425; Snyder Decl.Ex. 1).
Conway denies the truthfulness of the majority of this testimony. (Conway Depo. 414-427, 430-431). However, he admits that if the testimony were true, the International Union would be correct in concluding that he had not fulfilled his duties as Business Manager. (Conway Depo. 431). This Court agrees and, in the absence of evidence that Bernard knew or had reason to know the witnesses failed to tell the truth, finds that plaintiffs' have failed to establish that Conway was denied a full and fair hearing on the grounds that his guilt was prejudged.[18]

B. Documents
Plaintiffs claim that Conway was denied a full and fair hearing because he received none of the documentation he deemed necessary to defend himself. Defendants argue that the International Union was not required to comply with Conway's expansive request for pre-hearing discovery.
"[P]arties to judicial or quasi-judicial proceedings are not entitled to discovery as a matter of constitutional right." NLRB v. Valley Mold Co., Inc., 530 F.2d 693, 695 (6th Cir.1976). In Valley Mold, the defendant employer objected to the fact it was not permitted to depose employees and others prior to a hearing regarding backpay. Id. at 694. The Sixth Circuit rejected this claim, stating,
The [National Labor Relations] Act does not require the Board to follow the discovery procedures set forth in the Federal Rules of Civil Procedure. Since there is no specific provision in the Act for discovery procedures, it is the responsibility of the Board, so long as it conforms to the requirements of due process, to formulate its own rules as to when discovery is available to a party. It is a matter within the discretion of the Board as to whether to participate in or permit pretrial discovery.
Id. at 694-695 (citations omitted).
Similarly, in this case, the LMRDA does not require labor organizations to adhere to the Federal Rules of Civil Procedure, nor does it set forth specific pre-hearing discovery procedures. Thus, the International Union has discretion as to when and what discovery is available to the parties involved in a disciplinary hearing so long as the basic requirements of due process are not violated. See also Hardeman, 401 U.S. at 246, 91 S.Ct. 609 (noting § 101(a)(5)(C) was characterized "on the Senate floor as requiring the `usual reasonable constitutional basis' for disciplinary action"); Mayle, 866 F.2d at 146 ("The LMRDA only requires that the basic principles of due process be applied to union disciplinary hearings."); Kuebler v. Cleveland Lithographers & Photoengravers Union Local 24-P, 473 F.2d 359, 363-364 *752 (6th Cir.1973) (holding full and fair hearing requirement incorporates "traditional concepts of due process").
The basic elements of constitutional due process include notice and the right to be heard. Canfield Aviation, Inc. v. National Transp. Safety Bd., 854 F.2d 745, 750 (5th Cir.1988) (citing Mullane v. Central Hanover Bank and Trust Co., 339 U.S. 306, 70 S.Ct. 652, 94 L.Ed. 865 (1950)). See also Mathews v. Eldridge, 424 U.S. 319, 333, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976) ("The fundamental requirement of due process is the opportunity to be heard `at a meaningful time and in a meaningful manner.'"). The purpose of the notice requirement "is to apprise the affected individual of, and permit adequate preparation for, an impending hearing." Canfield Aviation, 854 F.2d at 750. However, constitutional due process does not require that the accused be notified of every witness and every item of evidence the charging body intends to use to prove its case. Id. (finding due process not violated in hearing before National Transportation Safety Board where plaintiff not notified of government's intention to cross-examine and call certain witnesses). Rather, the primary purpose of pre-hearing discovery "is to ensure that plaintiff had an adequate opportunity to prepare or develop his defense to the charges leveled against him." Yashon v. Hunt, 825 F.2d 1016, 1026 (6th Cir.1987) (finding due process not violated in hearing before hospital administrative staff where plaintiff not permitted any discovery).
Prior to the ratification hearing, Bernard provided Conway with copies of the letters from Walters and Gray and informed him of the identity of the contractors Fujawa spoke with regarding manpower issues. (Bernard Depo.Ex. 11).
After Conway was notified of the charges against him, he presented Bernard with an expansive discovery request. Among the 17 categories of documents sought, Conway requested "All union records regarding the trusteeship of Local 3, including notes, correspondence, and reports;" "All notes, records and/or other documents in the possession of the International Union since January 1999;" "All internal union charges brought by the International President against a member in the last ten years and the results of those charges;" and "A list of all local unions that have been investigated by the Department of Labor for criminal activity in the last ten years."[19] (Pltf.Ex.50).
In response, Bernard noted the breadth of Conway's request and the fact that the International Union and Bylaws do not provide for pre-hearing discovery. (Pltf.Ex.51). Bernard also stated that he could not and would not shut down the International Union office in order to comply with Conway's request, but indicated that "if there is a specific document or specific documents (either in the General Office or in Local 3's office) that you know to exist and that you want to examine to prepare for your hearing, please let me know, and I will make them available to you." (Pltf.Ex.51).
Plaintiffs argue that the Sixth Circuit's holding in Kuebler indicates that Conway should have been provided with all the documents he requested prior to his disciplinary hearing. In Kuebler, the plaintiff was tried before the Trial Board of his local union for attending a meeting "held for the purpose of undermining the Union Negotiating Committee." 473 F.2d at 360. After his trial, the plaintiff was found guilty, his union membership was suspended for three months and he was fined. Id. *753 The plaintiff then filed a notice of appeal and requested the following documents:
copies of the charges against him, showing specific offenses alleged and supporting facts; the names of persons included on the Executive Board which had tried him; a copy of the written decision of that tribunal with a showing of how each member had voted and a copy of the transcript of evidence and proceedings at his trial.
Id. at 361. The union denied this request, and plaintiff's conviction was affirmed. Id. The Sixth Circuit held that the union's refusal to provide the plaintiff with the requested documents "denied him a full and fair hearing on appeal." Id. at 364.
The circumstances of this case are markedly different from those present in Kuebler. In this case, Conway was provided with a detailed summary of the charges against him, as well as the recording of and exhibits from the ratification hearing. In addition, Bernard agreed to provide Conway with any identifiable document at his request. Conway, however, failed to request any such documents. Under the circumstances, this Court finds that Conway was not denied a full and fair hearing on the basis of the International Union's refusal to comply with his expansive and burdensome pre-hearing discovery request.

C. Timeliness
Plaintiffs also argue that defendants violated § 101(a)(5) of the LMRDA because the charges filed against Conway were untimely under the International Union Constitution and Bylaws. Defendants argue that the provision cited by plaintiffs does not apply to Conway's disciplinary hearing.
Article XXIV governs the procedures by which local union members can be penalized for certain enumerated offenses and states, in pertinent part,
Section 2. Charges against members must be signed and submitted in duplicate not more than ninety (90) days after the person preferring the charges has knowledge of the act or acts which form the basis for the charges.
(Bernard Third Decl.Ex. A). On the other hand, Article VII, Section 5(b), which describes the procedures by which the International Union General President can remove and discipline local officers, contains no time limitation. (Bernard Third Decl. Ex. A).
Bernard's letter notifying Conway of the charges against him and upcoming disciplinary hearing clearly states that he is acting pursuant to Article VII, Section 5(b). In addition, Article XXIV is simply inapplicable to the disciplinary proceedings at issue in this case. This Court finds that defendants did not violate any timeliness requirement of the International Constitution and Bylaws.
Therefore, defendants are entitled to summary judgment as to Count Five.

III. Defamation
Plaintiffs allege defendants are liable for making and republishing four defamatory statements about Conway. According to plaintiffs, Conway was defamed by the publishing of a written statement by Grogan, the republishing of Walters's and Gray's May 22, 2000 letters and Fujawa's remarks at the ratification hearing.
Defendants argue that they are entitled to summary judgment as to plaintiffs' defamation claims for a variety of reasons. First, defendants argue that none of the statements are defamatory because they do not purport to make statements of fact about Conway. Second, defendants argue that they did not publish or republish the statements to a third party as required by Ohio law. Third, defendants argue that publication or republication of the *754 statements was protected by an absolute privilege because union ratification and disciplinary hearings are quasi-judicial proceedings. Finally, defendants argue that publication or republication of the statements was protected by a qualified privilege and plaintiffs have failed to present evidence of actual malice.
Under Ohio law, defamation is "a false publication that injures a person's reputation, exposes him to public hatred, contempt, ridicule, shame or disgrace, or affects him adversely in his trade or business." Sweitzer v. Outlet Communications, Inc., 133 Ohio App.3d 102, 726 N.E.2d 1084, 1088 (10th Dist.1999). The elements of a defamation claim have been set forth as:
(a) a false and defamatory statement concerning another;
(b) an unprivileged publication to a third party;
(c) fault amounting at least to negligence on the part of the publisher; and
(d) either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication.
Akron-Canton Waste Oil, Inc. v. Safety-Kleen Oil Serv., Inc., 81 Ohio App.3d 591, 611 N.E.2d 955, 962 (9th Dist.1992).
A true statement is not actionable no matter how injurious it is to the plaintiff. See O.R.C. § 2739.02 (stating proof of the truth of an allegedly defamatory statement "shall be a complete defense"). See also Linn v. United Plant Guard Workers of America, Local 114, 383 U.S. 53, 63, 86 S.Ct. 657, 15 L.Ed.2d 582 (1966) ("[T]he most repulsive speech enjoys immunity provided it falls short of a deliberate or reckless untruth.").
Similarly, a statement of opinion cannot provide the basis for a claim of defamation. See Scott v. News-Herald, 25 Ohio St.3d 243, 496 N.E.2d 699, 705 (1986) ("Expressions of opinion are generally accorded absolute immunity from liability under the First Amendment."). The Ohio Supreme Court recently held that the Ohio Constitution requires "a categorical determination of whether, under the totality of the circumstances, an ordinary reader of the allegedly defamatory statements would deem them to be statements of fact or opinion." Wampler v. Higgins, 93 Ohio St.3d 111, 752 N.E.2d 962, 971 (2001). Whether a statement constitutes opinion or fact is a question of law that involves at least four factors: (1) the specific language used; (2) whether the statement is verifiable; (3) the general context of the statement; and (4) the broader context in which the statement appeared. Vail v. Plain Dealer Publishing Co., 72 Ohio St.3d 279, 649 N.E.2d 182 (1995), syllabus.

A. Grogan Testimonial
In a statement entitled "Testimonial of General Secretary-Treasurer for the hearing of Business Manager Michael Conway and supervision of Local 3," Grogan states,
This narrative will serve as a declaration of incidents involving Local 3 and its Business Manager, Mike Conway. It is meant to support the trusteeship of Local 3, and hopefully the removal of Mike Conway as an officer of Local 3.
(Grogan Depo.Ex. 14). In that statement, Grogan describes his telephone conversation with Walters during the Executive Board Meeting and relates the following:
[Walters] said he had a non-union shop for approximately five years before. He had worked seven years as a lead man for a different non-union shop, and they were never harassed by Local 3 in those years, and stated he worked, and his company worked right along with Cleveland union members, and was never harassed. Four days after he signed a union contract, however, someone went *755 to the Statlor job at night, and threw material down the shaft. The night guard said the men were looking for the insulation contractor.
(Grogan Depo.Ex. 14). In response to this incident, Walters asked Grogan and Fujawa why he was being harassed now that he had become a union contractor. (Grogan Depo.Ex. 14). According to Grogan's statement, when asked on more than one occasion if he or any Local 3 members were at the Statlor job site after Walters became a signatory contractor, Conway repeatedly responded, "No." (Grogan Depo. Ex. 14). Grogan's statement then goes on to discuss how Conway was later confronted with the complaints against him, including the Statlor site vandalism allegation:
[Walters] told [Conway] about being harassed, only since he became a union contractor, and never was while he was non-union, and he was not going to put up with this. During this conversation, the "Statlor" job was referred to by me, and out of the blue Business Manager Conway blurts out that he and his brother were on the job in the evening. We were all astounded by this statement, and after a brief pause [Walters] stated "You're admitting that it was you that was on the job at 10 o'clock?" Business Manager Conway said "Well in the evening".
(Grogan Depo.Ex. 14).
Plaintiffs claim that Grogan's letter identifies Conway as the vandal "by clear implication." Thus, plaintiffs argue, Grogan's remarks are defamatory because they accuse Conway of criminal activity and were published at the ratification and disciplinary hearings. In addition, plaintiffs argue that statements made at a union hearing are not absolutely privileged. Plaintiffs also argue that Grogan made the statements with actual malice, as evidenced by his stated intent to remove Conway from office.
Grogan's Testimonial contains several statements of fact. However, none of these statements provide the basis for a defamation claim because plaintiffs have failed to establish that they are false. Plaintiffs do not dispute that Walters told Grogan that "someone" threw materials down a shaft. Neither do plaintiffs dispute that Conway later admitted to being at the Statlor job site in the evening. What plaintiffs object to is the implication that these two undisputed factual statements create.
Thus, defendants argue that they are entitled to summary judgment because plaintiffs are actually asserting a claim of libel per quod, but have failed to plead or prove special damages.
In order for words to be libelous per se, they "must be of such a nature that courts can presume as a matter of law that they tend to degrade or disgrace the person of whom they are written or spoken, or hold him up to a public hatred, contempt or scorn." Moore v. P.W. Publishing Co., 3 Ohio St.2d 183, 209 N.E.2d 412, 415 (1965). Thus, in order for a statement to constitute libel per se, "it must be defamatory on its face and by the very meaning of the words." McGee v. Simon & Schuster, Inc., 154 F.Supp.2d 1308, 1315 (S.D.Ohio 2001) (citations omitted). On the other hand, libel per quod is defined as "libel by an interpretation, through an innuendo, between an innocent or harmless meaning and a libelous one." Becker v. Toulmin, 165 Ohio St. 549, 138 N.E.2d 391, 397 (1956). See also McCartney v. Oblates of St. Francis de Sales, 80 Ohio App.3d 345, 609 N.E.2d 216, 222 (6th Dist. 1992).
Libel per quod may occur where a publication, which, of itself, or per se, is not libelous, becomes so by the use of an innuendo rendering the apparently harmless words into libelous ones by *756 extrinsic evidence or, as is said, aliunde, as distinguished from per se.

Becker, 138 N.E.2d at 397. Thus, if the statement adopts a defamatory implication only through the interpretation of the reader, it constitutes libel per quod. McGee, 154 F.Supp.2d at 1315. Whether defamation is per se or per quod is a question of law. Becker, 138 N.E.2d at 395.
In Becker, the plaintiff's former employer sent a letter to its business contacts indicating that the plaintiff had been terminated. Id. at 393. The letter did not expressly state that the plaintiff had been discharged for lack of professional competence Id. However, the plaintiff claimed that the letter suggested that fact to the reader. Id. at 397. The court found that the claimed libelous words constituted libel per quod because they required innuendo for a determination of their defamatory character. Id. at 398. See also McGee, 154 F.Supp.2d at 1314-1315 (finding allegation that victim's parents settled legal claim with hospital and settlement agreement contained confidentiality agreement was, at worst, libel per quod).
In an action for libel per quod, a "publication is not actionable in the absence of proof of special damages to the one claiming to be libeled." Becker, 138 N.E.2d at 397; Moore, 209 N.E.2d at 416. Plaintiffs did not plead and have not established any special damages suffered by Conway as a result of the publication of Grogan's Testimonial. Rather, plaintiffs merely allege general damage to Conway's reputation and request an award of "compensatory and punitive damages, jointly and severally, against all Defendants on the pendent state law claims." (Am. Compl. at 22). Therefore, this Court finds that Grogan's statements are not actionable.
Even if this Court were to further consider the merits of plaintiffs' claim, however, it must fail on the basis of qualified privilege.
In a case involving libel per quod, the dispositive question is whether a reasonable factfinder could conclude that the challenged statements imply a defamatory meaning. Milkovich v. Lorain Journal Co., 497 U.S. 1, 21, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990). The meaning of the allegedly defamatory statements must be assessed from the perspective of the reasonable reader. Id. See also McKimm v. Ohio Elections Commission, 89 Ohio St.3d 139, 729 N.E.2d 364, 371 (2000). This Court finds that the only reasonable inference to be drawn from Grogan's Testimonial is his belief that Conway threw material down a shaft at the Statlor job site. See Id. at 372 (finding truthful factual statements accompanied by cartoon of hand passing money under a table "implied to a reasonable reader that [plaintiff] actually accepted cash for his vote to award the lucrative, unbid construction contract").
A charge of criminal activity is sufficient to sustain an action for defamation. Kelly v. Schmidberger, 806 F.2d 44, 47 (2d Cir.1986); Akron-Canton Waste Oil, 611 N.E.2d at 962. Thus, this Court finds that the statements contained in Grogan's Testimonial are actionable unless they are protected by an absolute or qualified privilege.
Privilege provides a defense to a defamation claim. A & B-Abell Elevator Co. v. Columbus/Central Ohio Building & Construction Trades Council, 73 Ohio St.3d 1, 651 N.E.2d 1283, 1290 (1995). As explained by the Ohio Supreme Court,
Privilege communications are divided into two general classes those which are absolutely privileged, and those which are qualifiedly or conditionally privileged. The basic difference between the *757 two as generally stated is that complete protection is afforded by absolute privilege, whereas a qualified or conditional privilege affords protection only in the absence of ill motive or malice in fact.
Costanzo v. Gaul, 62 Ohio St.2d 106, 403 N.E.2d 979, 982 (1980). Ohio courts recognize the existence of an absolute privilege "in only very limited areas of activity in our society," including "legislative and judicial proceedings, and other acts of state." Id. See also Bigelow v. Brumley, 138 Ohio St. 574, 37 N.E.2d 584, 588 (1941) (limiting absolute privilege to legislative proceedings, "judicial proceedings in official courts of justice," official acts of state or federal executive offices and acts done in the exercise of military or naval authority).
Defendants argue, however, that union hearings of the type involved in this case are protected by an absolute privilege.
In Stiles v. Chrysler Motors Corp., 89 Ohio App.3d 256, 262-263, 624 N.E.2d 238 (6th Dist.1993), the court recognized that federal labor law preempts state defamation law and provides management and union representatives with an absolute privilege to make defamatory statements during conferences and bargaining sessions "having for [their] purpose the adjustment of a grievance of the employee or other disposition of such grievance." (quoting General Motors Corp. v. Mendicki, 367 F.2d 66 (10th Cir.1966)). The court in Stiles also recognized federal preemption in connection with termination hearings. Id. at 263, 624 N.E.2d 238. The determining factor, however, is whether the statement was made "during or in connection with dispute resolution processes governed by a collective bargaining agreement." Id.
While the ratification and disciplinary hearings in this case were authorized by the International Union Constitution and Bylaws, they cannot properly be characterized as dispute resolution or grievance hearings. In that this Court has been unable to locate case law in support of defendants' argument that union hearings outside the dispute resolution context should be protected by an absolute privilege,[20] it will not extend Ohio's doctrine of absolute privilege to all types of union hearings at this time.
Whether a statement is protected by a qualified privilege is a question of law where the circumstances of the occasion in which the statement was made are not in dispute. A & B-Abell Elevator, 651 N.E.2d at 1290. The publication of an otherwise actionable defamatory statement is privileged when it is "fairly made by a person in the discharge of some public or private duty, whether legal or moral, or in the conduct of his own affairs, in matters where his interest is concerned." Id. (quoting Hahn v. Kotten, 43 Ohio St.2d 237, 331 N.E.2d 713 (1975)). In other words, a qualified privilege attaches
where circumstances exist, or are reasonably believed by the defendant to exist, which cast on him the duty of making a communication to a certain other person to whom he makes such communication in the performance of such duty.
Id. It is important to note that a qualified privilege attaches to the occasion on which the allegedly defamatory statement was made, not to the statement itself. Id.
In light of the above, this Court is persuaded that, faced with the issue, the Ohio Supreme Court would recognize at least a qualified privilege for statements made during the type of union hearings at *758 issue in this case. Thus, this Court finds that Grogan's statements are protected by a qualified privilege because they were made in the context of the ratification and disciplinary hearings. As such, they were made in the discharge of his duties as the General Secretary-Treasurer of the International Union and as one who had firsthand knowledge of the complaints made against Conway. See Sullivan v. Conway, 157 F.3d 1092, 1098 (7th Cir.1998) (finding qualified privilege protected statements by International Union officials discussing local union's troubles and informing local union members of trusteeship and other administrative matters).
Once a defendant asserts that his statements were made in good faith pursuant to some duty or perceived duty, the plaintiff has the burden of showing by clear and convincing evidence that the statements were made with actual malice. A & B-Abell Elevator, 651 N.E.2d at 1291-1292. To establish that a statement was made with actual malice, "one must show that the publisher acted with knowledge of the statement's falsity or with reckless disregard as to its truth or falsity." New York Times v. Sullivan, 376 U.S. 254, 279-280, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). See also Jacobs v. Frank, 60 Ohio St.3d 111, 573 N.E.2d 609 (1991), paragraph two of the syllabus. To establish that a statement was made with "reckless disregard," a plaintiff must present evidence that the defendant "had serious doubts as to the truth of his publication." A & B-Abell Elevator, 651 N.E.2d at 1293. The failure to investigate a statement before publishing it will not defeat a qualified privilege, "unless the defendant entertained serious doubts as to the truth of his statements or the veracity or accuracy of his sources." Id. A plaintiff may not establish actual malice merely by showing that the defendant's interpretation of facts was false; "he must prove with convincing clarity that defendant was aware of the high probability of falsity." Jacobs, 573 N.E.2d at 616. Similarly, actual malice cannot be inferred from evidence of mere personal spite or ill will. McKimm, 729 N.E.2d at 373. Although ill will may be relevant to a finding of falsity, the focus must be on the defendant's "attitude toward the truth or falsity of the publication" not toward the plaintiff. Id.
Plaintiffs claim that Grogan acted with actual malice because he desired to remove Conway from office. None of the evidence submitted by plaintiffs establishes that Grogan bore any personal ill will towards plaintiff other than that fostered by his belief that Conway was not properly performing his duties as Business Manager. In any case, such ill will would not establish the requisite actual malice in the absence of evidence establishing that Grogan was aware of at least the high probability of the falsity of the accusations against Conway. The evidence establishes that Grogan based his Testimonial on his own observations as well as on the oral and written complaints of Walters. Grogan avers,
The statements from Gray and Walters that were attached to my letter to Fujawa contained some unflattering remarks about Mike Conway. At the time I received the statements from Gray and Walters I did not form a belief as to whether the remarks were true or not. On May 24, 2000, after speaking with Walters and Mike Conway, I concluded that Conway had been dishonest and that the remarks of Gray and Walters were true.
(Grogan Decl. ¶ 7). Plaintiffs present absolutely no evidence to contradict Grogan's claim. Therefore, this Court finds that Grogan's Testimonial is protected by a qualified privilege. See Mosley v. Evans, 90 Ohio App.3d 633, 630 N.E.2d 75, 78 (11th Dist.1993) (finding no actual malice *759 where conclusions were based on defendants' observations and conversations with others).

B. Walters Letter
Grogan attached a copy of the May 22, 2000 letter written by Walters to his Testimonial. In that letter, Walters explains that he was initially skeptical about signing an agreement with Local 3 but finally did so in Akron:
I signed with Local # 84/3[.] "Mike Mollohan" never harassed myself or my company but talked with respect and answered questions completely. I would never have signed with Local # 3 Cleveland. That local is bad news I mean corrupt and to [sic] political. That is not how you run a union.
(Grogan Depo.Ex. 14).
Plaintiffs argue that this statement is defamatory because it implies that Conway and/or his management of Local 3 are "bad news" and "corrupt." In addition, plaintiffs argue that the defamatory statement is actionable because it was republished by Fujawa at the ratification and disciplinary hearings with reckless disregard for its truth.
Ohio Revised Code § 2739.01 states, in pertinent part,
In an action for a libel or slander, it is sufficient to state, generally, that the defamatory matter was published or spoken of the plaintiff. If the allegation is denied, the plaintiff must prove the facts, showing that the defamatory matter was published or spoken of him.
Thus, plaintiffs bear the burden of proving that Walters's statements refer to Conway.
It is not obvious from the face of the letter that Conway is the target of Walters's charge of corruption. In fact, Conway himself testified that he believed the statement was critical of "Local 3 irrespective of who was in office." (Conway Depo. 318). Conway also testified that he did not know if the statement referred to Local 3 during his or Scarl's administration. (Conway Depo. 318-319). In addition, Walters's statement can be read merely as an explanation of why he had not become a signatory contractor prior to May 2000 rather than as a statement that Conway is corrupt. According to the innocent construction rule, "if allegedly defamatory words are susceptible to two meanings, one defamatory and one innocent, the defamatory meaning should be rejected, and the innocent meaning adopted." Yeager v. Local Union 20, 6 Ohio St.3d 369, 453 N.E.2d 666, 669 (1983).
Therefore, this Court finds that the statements contained in Walters's letter and attached to Grogan's Testimonial are not actionable.

C. Gray Letter
Grogan also attached a copy of the May 22, 2000 letter written by Gray to his Testimonial. In that letter, Gray relates a conversation he had with Conway about his interest in signing an agreement with Local 3. (Grogan Depo.Ex. 14). Gray then states,
After leaving local 3 I asked many contractors about joining and every single one told me to stay away from Conway [because] he is sneaky and he will do everything he can to put my company out of business.
(Grogan Depo.Ex. 14).
Plaintiffs argue that this statement is defamatory because it adversely impacted Conway in his business or profession as Business Manager of Local 3. In addition, plaintiffs argue that the defamatory statement is actionable because it was republished by Fujawa at the ratification and disciplinary hearings with reckless disregard for its truth.
*760 Gray's statement cannot provide the basis for a defamation claim because plaintiffs have failed to establish that it is false. Plaintiffs do not dispute that other contractors told Gray that Conway was "sneaky" and would try to put his company out of business. Therefore, this Court finds that the statements contained in Gray's letter and attached to Grogan's Testimonial are not actionable.

D. Fujawa Remarks
As set forth in Fujawa's Second Declaration,[21]
After one witness testified [at the ratification hearing] that Local 3's hiring hall had been operating properly, I told him my opinion that, "I think you and probably several others in this union have been totally misinformed and you've been deceived in some way." After explaining that the hiring hall had not been operating properly, I said, "if there should be any anger in the Local, I think it should be directed at the acting business manager at the time, Mike Conway, because he failed to provide the people with" employees from the hiring hall.
(Fujawa Second Decl. ¶ 6).
According to plaintiffs, Fujawa's statements are defamatory because they imply that Local 3 members were misinformed and deceived by Conway. In addition, plaintiffs argue that the defamatory statements are actionable because they were made at the ratification hearing in the absence of evidence that Conway deceived any Local 3 member.
When viewed in the context of the trusteeship ratification hearing, this Court finds that Fujawa's statements do not constitute factual assertions. It is important to remember that Fujawa was acting as an advocate on behalf of ratification of the trusteeship, and any statement by him must be construed in light of that role. The general context in which an advocate's statements are made is argument, as opposed to the factual evidence elicited through witnesses. In response to a witness's statement that the Local 3 hiring hall was being operated in accordance with the International Union Constitution and Bylaws. Fujawa opined that this assessment was based on misinformation and deception and that Conway was responsible. This is a point of view that is obviously subjective and based on Fujawa's interpretation of the facts and the International Union Constitution and Bylaws. In addition, to the extent Fujawa's statements can be read as a factual assertion that Conway failed to supply manpower to contractors, Conway has admitted that he did so on at least two occasions. Therefore, this Court finds that Fujawa's statements are not actionable.
Even if Fujawa's statements were actionable, for the reasons set forth above, they are protected by a qualified privilege. Plaintiffs claim that Fujawa wanted to remove Conway from office at any cost. Plaintiffs also argue that actual malice is shown by the fact that there is no evidence to support Fujawa's statement that Conway deceived any Local 3 members. However, as stated above, a showing of personal ill will or objective falsity are insufficient to establish actual malice. Plaintiffs have presented no evidence that Fujawa knew his statements were false or that he made them with reckless disregard for their falsity. To the contrary, all of the evidence indicates that Fujawa genuinely believed Conway was responsible for a variety of misconduct, including improperly operating Local 3's hiring hall. See Bertsch v. Communications Workers of America, Local 4302, 101 Ohio App.3d 186, 655 N.E.2d 243, 247 (9th Dist.1995) (finding no actual *761 malice in criticisms of plaintiff where union members had made numerous complaints regarding payroll calculation and payroll was exclusively her responsibility).
Therefore, defendants are entitled to summary judgment as to plaintiffs' defamation claims.[22]

IV. Intentional Infliction of Emotional Distress
Plaintiffs allege defendants intentionally inflicted emotional distress on Conway by removing him from office on pretextual grounds and making various statements to him. According to plaintiffs, defendants' threats to "blacklist" Conway, take his job and end his union membership were far outside the bounds of decency in a civilized society.
Defendants argue that the same privileges that apply to plaintiffs' defamation claims also apply to plaintiffs' claims of intentional infliction of emotional distress. Alternatively, defendants argue that the conduct at issue does not rise to the level of outrageous conduct required for relief.
To establish a claim for intentional infliction of emotional distress, plaintiffs must show: (1) defendants intended to cause Conway emotional distress or knew or should have known their actions would result in serious emotional distress to him; (2) defendants' conduct was outrageous and extreme; (3) defendants' actions proximately caused Conway's emotional injury; and (4) plaintiff suffered serious emotional anguish. Hanly v. Riverside Methodist Hosp., 78 Ohio App.3d 73, 603 N.E.2d 1126, 1132 (10th Dist.1991); Uebelacker v. Cincom Systems, Inc., 48 Ohio App.3d 268, 549 N.E.2d 1210, 1219 (1st Dist.1988); Yeager, 453 N.E.2d at 670-672. Quoting comment d to Section 46 of the Restatement of Law 2d, Torts, the Ohio Supreme Court has held,
Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor and lead him to exclaim, "Outrageous!"
The liability clearly does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities. The rough edges of our society are still in need of a good deal of filing down, and in the meantime plaintiffs must necessarily be expected and required to be hardened to a certain amount of rough language, and to occasional acts that are definitely inconsiderate and unkind. There is no occasion for the law to intervene in every case where some one's feelings are hurt. There must still be freedom to express an unflattering opinion, and some safety valve must be left through which irascible tempers may blow off relatively harmless steam.
Id. at 671-672. The alleged injury must be severe enough that "a reasonable person, normally constituted, would be unable to cope adequately with the mental distress engendered by the circumstances of the case." Paugh v. Hanks, 6 Ohio St.3d 72, 451 N.E.2d 759 (1983), paragraph 3a of the syllabus.
[A]n action to recover for emotional distress may not be premised upon mere embarrassment or hurt feelings, but *762 must be predicated upon a psychic injury that is both severe and debilitating. Proof of serious emotional distress may be offered in the form of expert medical testimony, but expert opinion is not indispensable. Lay witnesses acquainted with the plaintiff may also testify to significant changes that they have observed in the emotional or habitual makeup of the plaintiff.
Uebelacker, 549 N.E.2d at 1220 (citations omitted).
Although plaintiffs claim to base their intentional infliction of emotional distress claims on Conway's removal and various statements, they specifically identify only the statements made by Grogan during a break in the Local 3 officers' meeting on May 24, 2000 and those made by Fujawa during the ratification meeting.
For the reasons stated above, this Court finds that plaintiffs have failed to establish that Conway was removed from office on pretextual grounds. Therefore, Conway's removal cannot provide a basis for recovery for intentional infliction of emotional distress.
In addition, this Court finds that the statements by Grogan and Fujawa fall far short of the level of outrageousness required to sustain a claim under Ohio law.[23]
Grogan admits that he told the Local 3 officers that he had received complaints from contractors concerning Local 3 and Mike Conway and said, "if the allegations are true, I will have his [Mike Conway's] f***ing job." (Grogan Decl. ¶ 4). Similarly, Boyle testified that Grogan said, "if these allegations turn out to be true that he would tear his f***ing book up and he would never work as a union insulator again or hold office either."[24] (Boyle Depo. 28). According to Boyle, all the meeting attendees were "quite shocked" by Grogan's comments and stared with their mouths hanging open. (Boyle Depo. 26).
As set forth above, Fujawa avers that he told a witness at the ratification hearing that he had probably been "totally misinformed and ... deceived in some way" and that any anger in the Local should be directed at Conway. (Fujawa Second Decl. ¶ 6).
Conway admits that if the charges against him were true, the International Union could correctly conclude that he had not fulfilled his duties as Business Manager. While Grogan's raised voice and use of obscenities may have caused Conway to feel threatened, this Court finds that Grogan's threats to take actions which the International Union would be justified in taking do not constitute outrageous and extreme conduct under Ohio law. See Argentine v. United Steel Workers Assoc., 23 F.Supp.2d 808, 821-822 (S.D.Ohio 1998) ("Imposing a trusteeship without due process or calling someone names does not rise to the level of atrocity that is utterly intolerable in a civilized community."). As stated above, Conway is expected and required *763 to be hardened to a certain amount of rough language and unkind acts, and the acts at issue in this case do not rise to an actionable level.[25]See Starr v. Pearle Vision, Inc., 54 F.3d 1548, 1558 (10th Cir. 1995) (finding evidence supervisor yelled at plaintiff and pushed her down into a chair during the course of an internal embezzlement investigation insufficient to establish outrageousness); Schneider v. TRW, Inc., 938 F.2d 986, 992 (9th Cir.1991) (finding evidence manager screamed and made threatening gestures towards employee insufficient to establish outrageousness); Maxwell v. GTE Wireless Service Corp., 121 F.Supp.2d 649, 661 (N.D.Ohio 2000) (finding evidence supervisor criticized plaintiff's poor performance, threw a book, yelled at him and accused him of being unprepared for his job insufficient to establish outrageousness). Cf. Reamsnyder v. Jaskolski, 10 Ohio St.3d 150, 462 N.E.2d 392, 393-395 (1984) (finding plaintiff stated a cause of action for intentional infliction of emotional distress where rental car agent told plaintiff he had reported car stolen and threatened to "tear [plaintiff's] face off" if he did not return it).
Similarly, Fujawa's statement that Local 3 members should be angry at Conway for having deceived them is clearly not the type of conduct "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and be regarded as atrocious, and utterly intolerable in a civilized community."
In addition, plaintiffs' intentional infliction of emotional distress claims must fail because plaintiffs have failed to present any evidence that Conway suffered a severe and debilitating psychic injury caused by defendants' conduct.
Therefore, defendants are entitled to summary judgment as to plaintiffs' intentional infliction of emotional distress claims.

V. Claims Against Walters
Count Four is the only remaining count of the Amended Complaint that contains allegations against Walters. Because the statements attributed to Walters are not actionable as a matter of law, this Court has determined sua sponte that Walters is entitled to summary judgment as to plaintiffs' defamation and intentional infliction of emotional distress claims.[26]

CONCLUSION
For these reasons, Plaintiff Conway's Motion for Partial Summary Judgment Concerning Liability on His Fifth Cause of Action is denied and Labor Defendants' Motion for Summary Judgment is granted. In addition, judgment is hereby entered in favor of defendant Walters and against plaintiffs.
IT IS SO ORDERED.
NOTES
[1] Grogan is now the International Union's General President. (Grogan Decl. ¶ 1).
[2] Further proceedings as to defendant Gray only were perpetually stayed by this Court on May 22, 2001.
[3] During Scarl's administration, Local 3 (Cleveland) was merged with Local 35 (Youngstown) and Local 84 (Akron). (Bernard Depo. 47-48).
[4] Mike Mollohan served as Business Agent for the Akron area Local 3 members after the merger. (Grogan Depo.Ex. 11).
[5] Signatory contractors are required to hire needed employees from the out-of-work list. (Bernard Third Decl. ¶ 6).
[6] At this time, Sweeny served as Local 3 President. (Grogan Depo.Ex. 11).
[7] Apparently, Conway and other Local 3 members were opposed to organizing because they feared that a greater number of union members would result in less work for each member.
[8] Presumably, documentation of an individual's refusal to work would protect Local 3 from liability arising out of his or her removal from the out-of-work list.
[9] Al Snavley served as Business Agent for the Youngstown area Local 3 members after the merger. (Pltf.Mot. at 13).
[10] For the purposes of this opinion and unless otherwise noted, the term "defendants" will be used to refer to the International Union, Grogan and Fujawa.
[11] Sullivan was previously working as a supervisor and ineligible to run for office for 90 days after reactivating his union membership, which he did in March 1999. (Bernard Depo. 111-112).
[12] During his deposition, Bernard testified,

Q: It is a true statement, is it not, that in March 1999 Scottie Sullivan was not eligible to run for the office of business manager?
A: That's what I understand.
Q: I mean he was a supervisor and he was on the withdrawal card at the time, right?
A: That's what I was told.
(Bernard Depo. 112). Plaintiffs have failed to establish, however, that Bernard possessed this knowledge at the time he directed that an audit be conducted.
[13] Article XX, Section 10 of the International Union Constitution and Bylaws provides that a vacancy in office "shall be filled by special nomination and election for the remainder of the term of the office vacated, within fifty (50) days." (Bernard Third Decl.Ex. A).
[14] COMET stands for Construction Organizing Membership Education Training. (Pltf.Ex.6). COMET, a program designed to encourage existing union members to organize, is one of several tools used to further the International Union's organization efforts. (Grogan Depo. 151-153).
[15] The job at issue was located in Mansfield, Ohio. (Snyder Decl.Ex. 1).
[16] Conway now attempts to justify the fact that he failed to refer employees to Roberts because of her company's "persistent delinquency in remitting benefit contributions mandated by the Local 3 collective bargaining agreement." (Pltf.Opp. at 18). However, this argument is in direct contradiction to Conway's deposition testimony, in which he states,

Q: Pat Roberts of Patrician [sic] testified at the trusteeship hearing, didn't she?
A: Yes, she did.
Q: She testified you wouldn't supply her with men because she wasn't current in her dues and fringe benefits statement.
A: She maintained that but I disagree with that. That is untrue, I deny that.
(Conway Depo. 232).
[17] As stated above, plaintiffs failed to present evidence that Bernard desired to oust Conway from office and install Sullivan in his place. Conway testified that, not only did he vote for Grogan, Fujawa and Bernard in 1992, he was "one of 25 people Mr. Bernard picked to be on his inner-group to set [sic] and discuss the International at the coming convention." (Conway Depo. 14-15). Simply stated, nothing in the record supports plaintiffs' contention that defendants bore any animosity towards or bias against Conway.
[18] Plaintiffs also point to Grogan's Testimonial as evidence that Conway's guilt was prejudged. However, Grogan served as a witness during Conway's disciplinary hearing and there is no evidence to suggest that he participated in the decision-making process. To the contrary, the evidence presented establishes that Bernard made the final determination of Conway's guilt based upon the hearing transcript and exhibits.
[19] Conway's request likely exceeds the scope of discoverable information under the Federal Rules of Civil Procedure, let alone the basic requirements of due process.
[20] Indeed, at least one Ohio court appears to grant only a qualified privilege to statements made in the course of a union grievance procedure. Gray v. Allison Division, General Motors Corp., 52 Ohio App.2d 348, 370 N.E.2d 747 (8th Dist.1977).
[21] Neither party submitted a transcript of the ratification hearing to this Court.
[22] Because defendants are entitled to summary judgment as to plaintiffs' defamation claims on the grounds that the challenged statements are not actionable or are protected by a qualified privilege, defendants' arguments regarding publication need not be addressed.
[23] Defendants are correct that some otherwise actionable conduct may be privileged when "the actor ... has done no more than to insist upon his legal rights in a permissible way." Uebelacker v. Cincom Systems, Inc., 48 Ohio App.3d 268, 549 N.E.2d 1210, 1220 (1st Dist.1988). However, because defendants' conduct does not rise to the level of outrageousness required to be actionable, this Court need not address defendants' claims of privilege.
[24] Owens testified that Grogan threatened to reprimand or throw out of the union anyone who did not follow the International Union's directive to organize. (Owens Depo. 43). Reddy testified that Grogan said "he would take action against anybody that was against the organizing and any officer that was against the organizing" and, if the rumors were true, "he would have Mike Conway's f***ing book." (Reddy Depo. 59, 62).
[25] In the context of defamation claims, the Supreme Court has specifically recognized the particularly rough edges one is likely to run into during labor disputes and union elections. See, e.g., Linn v. United Plant Guard Workers of America, Local 114, 383 U.S. 53, 86 S.Ct. 657, 15 L.Ed.2d 582, (1966) ("Labor disputes are ordinarily heated affairs; language that is commonplace there might well be deemed actionable per se in some jurisdictions. Indeed, representation campaigns are frequently characterized by bitter and extreme charges, countercharges, unfounded rumors, vituperations, personal accusations, misrepresentations and distortions.").
[26] Similarly, Count Four is the only remaining count of the Amended Complaint that contains allegations against Gray. However, this Court does not currently have jurisdiction to dismiss plaintiffs' claims against Gray in that these proceedings have been perpetually stayed as to him.